NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————

GEORGE LAMBERT,                          :
                                          :
           Plaintiff,                     :          Hon. Dennis M. Cavanaugh
                                          :
     v.                                   :              **OPINION**
                                          :
                                          :          Civil Action No: 09-5187 (DMC)
MICHAEL J. ASTRUE,                        :
COMMISSIONER OF SOCIAL                    :
SECURITY,                                 :
                                          :
           Defendant.                     :
—————————————————————:

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

　　　This matter comes before the Court upon the appeal of George A. Lambert ("Plaintiff") from the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff's claims for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"), and for Supplemental Security Income ("SSI") under Title XVI of the Act. This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

　　　As detailed below, the final decision entered by the Administrative Law Judge ("ALJ"), in the absence of testimony by a vocational expert, must be **remanded** for further proceedings consistent with this Opinion.

1

# I.  BACKGROUND

### A.  PROCEDURAL HISTORY

In February 2006, Plaintiff filed both an application for a period of disability and disability insurance benefits, and an application for SSI, alleging disability beginning October 1, 2005. (Administrative Transcript ( "Tr.") at 101–05, 106–11).[1]  Plaintiff's claim was  initially denied on June 29, 2006 (Tr. at 54–59), and upon reconsideration on March 8, 2007. (Tr. at 62–66). Thereafter, Plaintiff filed a timely written request for a hearing before an Administrative Law Judge ("ALJ") on April 12, 2007. (Tr. at 67–68).   On June 26, 2008, a hearing was held before the Honorable Donna Krappa, ALJ (Tr. at 17–43), and on October 27, 2008 the ALJ denied Plaintiff's claims. (Tr. at 5–16).  Plaintiff sought review of the decision, but the Appeals Council denied his request on August 21, 2009. (Tr. at 1–4).  On October 13, 2009, Plaintiff filed a timely complaint with this Court seeking judicial review.

### B. FACTUAL HISTORY

#### 1. The Findings of the Administrative Law Judge

ALJ Krappa made the following eleven(11) findings regarding the Plaintiff's application for a period of disability and disability insurance benefits, and application for SSI: (1) the claimant meets the insured status requirements of the Social Security Act through December 31, 2008; (2) the claimant has not engaged in substantial gainful activity since October 1, 2005, the alleged onset date; (3) the claimant has the following severe impairments: depression, hepatitis C, and substance abuse

---

[1] There is some discrepancy as to the precise date Plaintiff's applications were filed.  The Initial Disability Determination Transmittals for Title II and Title XVI applications indicate a February 21, 2006 filing date, while the Applications for the same indicate a February 28, 2006 filing date.  *Compare* Tr. at 101–11 *with* Tr. at 50–51.  The difference in date is immaterial with regards to the present review and is noted now only to ensure accuracy.

in remission;[2] (4) the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; (5) the claimant has the residual functional capacity to perform simple, unskilled work at the light level as defined in 20 CFR 404.1567(b) and 416.967(b); (6) the claimant is unable to perform any past relevant work; (7) the claimant was born on August 6, 1956, and was 51-years-old, which is defined under the Regulations as an "individual closely approaching advanced age," on the alleged disability onset date; (8) the claimant has at least a high school education and is able to communicate in English; (9) transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled; (10) considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform; (11) the claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2005, through the date of this decision.

## 2. <u>Plaintiff's Medical History and Evidence</u>

Plaintiff alleges that he has been disabled since October 1, 2005, as a result of suffering from depression, hepatitis C, and substance abuse (in remission). This Court summarizes the Plaintiff's medical history and the evidence pertaining to his impairments below.

### i. General Medical History

At the date of the alleged disability onset, Plaintiff was 49 years of age[3] and his primary care

---

[2]In order to remain consistent with the Record, this opinion adopts the usage of the term "remission." As it relates to Plaintiff's prior substance abuse, and continued risk for substance abuse, the more appropriate term is "recovery."

[3]In her findings of facts, the ALJ found "[t]he claimant was born on August 6, 1956, and was *51-years-old*, . . . on the alleged disability onset date." However, the alleged disability onset date was October 1, 2005 making Plaintiff 49 years of age. The Court notes the discrepancy only to ensure accuracy. The medical records indicate the correct age of the Plaintiff. The incorrect recording in the findings of fact is harmless and has no substantive effect

physician was Dr. Robert Richards. (Tr. at 213). During a routine examination[4] with Dr. Richards, Plaintiff was found to have the Hepatitis C Virus ("HCV" or "Hepatitis C"). (Tr. at 213).  After the initial diagnosis, Plaintiff was examined extensively by Dr. Carroll B. Leevy at the University of Medicine and Dentistry of New Jersey–University Hospital ("UMDNJ") (*See* Tr. at 199–215, 216–51, 284–376).  Plaintiff's UMDNJ records range from September 2005 to November 2006 and reflect medical work ordered by both Dr. Richards and Dr. Leevy.  Dr. Leevy's notes from follow-up visits with Plaintiff on December 27, 2005 and January 31, 2006 indicate that Plaintiff suffers from chronic Hepatitis C.  (Tr. at 206–07).  The latter report also indicates that Plaintiff was "alert" and "coherent."  (Tr. at 206).  In each of these reports, the "Assessment" field indicated only chronic Hepatitis C; no other ailments were indicated.  (Tr. at 206–07).  The "Subjective" field from the December 2007 visit indicates that Plaintiff had no new complaints, (Tr. at 207), and the same field from the January 2006 visit indicates that Plaintiff was tolerating the medication well.  (Tr. at 206).

*ii. Internal Medicine Consultative Examination*

On June 14, 2006, the New Jersey Department of Labor, Division of  Disability Determination Services ("DDS") conducted a consultative examination performed by Dr. Henry Rubenstein (Tr. at 252–56).  Dr. Rubenstein reported the Plaintiff as "having hepatitis C which he probably acquired from illegal intravenous drug use in October 2005." (Tr. at 252).  Dr. Rubenstein noted that while Plaintiff has been on treatment since that time, "the medication has had to be stopped and then restarted several times" due to side effects, which, according to Plaintiff, included

---

on the merits of this matter.

[4]While the date of the routine examination with Dr. Richards is unknown, a New Jersey Medical School Lab Report dated September 26, 2005 indicates that Plaintiff tested "positive for [Hepatitis C]." (Tr. at 368).

"profound fatigue, drowsiness, insomnia, sleepiness during the day, [and] feeling as if he is going to pass out." Id.  Additionally, the Plaintiff told the doctor that the medication made him suicidal at times and that, because of the effects of the medication, he "does not feel he can work." Id.  Dr. Rubenstein reported that upon physical examination, Plaintiff was cooperative, answered questions in a reasonable manner, and was dressed appropriately.  (Tr. at 253).  Despite the Plaintiff falling asleep in the waiting room and examining room while waiting to be seen, Dr. Rubenstein described Plaintiff as "completely lucid and understandable" when awake.  Id.  Plaintiff's pulse, eyes, ears, nose and throat were all described as normal; Plaintiff's heart was described as regular; and Plaintiff had normal range of motion, normal muscle strength, a normal gait, and no difficultly getting on or off the examining table.  Id.

### iii. Psychiatric Consultative Examination Report

On June 17, 2006, DDS conducted a psychiatric consultative examination performed by Dr. Yeon C. Choe.  (Tr. at 257–59).  Plaintiff's chief complaint to Dr. Choe was being "awfully tired and weak because of hepatitis C treatment."  (Tr. at 257).  Dr. Choe reported that Plaintiff worked as a machine operator for three years, but stopped in 2004 because he was physically tired and weak.  Id.  Dr. Choe reported that upon mental status examination, Plaintiff was fairly developed, ambulatory, and oriented to place, person, and time.  (Tr. at 258).  While considering Plaintiff competent to handle his Social Security benefits, Dr. Choe diagnosed Plaintiff as having a mood disorder due to Hepatitis C, a history of heroin abuse, and the inability to continue working because of physical weakness and fatigue.  (Tr. at 258–59).

### iv. Initial Psychiatric Review Technique

As part of Plaintiff's disability determination, a psychiatric review was performed by Dr.

Michael A. D'Anton on June 22, 2006. (Tr. at 260–73). Dr. D'Anton reported that Plaintiff had an adjustment disorder, but that this impairment was not severe. (Tr. at 260). Dr. D'Anton recorded only "mild" limitations with regards to Plaintiff's restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. at 270). Plaintiff had no record of psychiatric hospitalizations, treatment, or prescriptions for psychotropic medication. (Tr. at 272). Dr. D'Anton reported that upon examination, Plaintiff was alert and oriented in all spheres and there was no evidence of a thought disorder. Id.

### v. Physical Residual Functional Capacity Assessment

As part of Plaintiff's disability determination, a Residual Functional Capacity ("RFC") assessment was completed by Dr. Howard Goldbas on June 28, 2006. (Tr. at 274–82). With regards to exertional limitations, Dr. Goldbas reported that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk with normal breaks for about six hours in an eight-hour work day, sit with normal breaks for about six hours in an eight-hour work day, and push and pull to the same extent as lifting. (Tr. at 275).[5] Dr. Goldbas' report indicated no postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. at 276–78). Dr. Goldbas found that Plaintiff's symptoms of fatigue and weakness were due to treatment for hepatitis C, were proportionate, and were consistent with the evidence. (Tr. at 279).

### vi. DDS Disability Worksheets

Two separate DDS Disability Worksheets ("Worksheet(s)") are contained in the record. (Tr.

---

[5]"Frequently means occurring one-third to two-thirds of an 8-hour day (cumulative, not continuous). Occasionally means occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous). (Tr. at 274).

at 282–83; 379–80).  The initial Worksheet identified Plaintiff's RFC as light and described Plaintiff's past relevant work as medium and semi-skilled.[6]  (Tr. at 283).  The Worksheet indicated that Plaintiff could not go back to his past relevant work as it was described or performed but that transferability of skills was not an issue.  Id.  Denying disability, the Worksheet also indicated three jobs plaintiff could perform in the national economy—buckle wire inserter, sticker, and puller-through.  Id.  Upon reconsideration, the second Worksheet confirmed Plaintiff's current RFC as light, confirmed Plaintiff's past relevant work as medium, and confirmed the denial of disability referencing the same three jobs available in the national economy.  Id.

*vii. Medical Reports of Treating Psychiatrist, Dr. Gita Parikh*[7]

On September 20, 2007, Dr. Gita Parikh performed a psychiatric evaluation of Plaintiff.  (Tr. at 382–85).  Dr. Parikh reported an Organic Affective Disorder requiring both individual and group psychotherapy as well as psychiatric evaluation, medication, and monitoring.  (Tr. at 382).  Dr. Parikh found the Plaintiff to be ambulatory and reported no functional limitations.  Id.  Finding no sensory disability, neurological disability, or orthopedic disability, Dr. Parikh still reported that the Plaintiff was incapacitated to the extent that he could not work full time for a period of six months

---

[6]The DDS Disability Worksheets' findings that Plaintiff's past work was medium was confirmed at the ALJ Hearing, *discussed infra*.  However, the initial finding of semi-skilled is contradicted by the following exchange between ALJ Krappa and Plaintiff's Attorney:

ALJ: Okay. And do you believe . . . that prior work is all unskilled?
ATTY: Yes.
ALJ: It's unskilled.
ATTY: Unskilled, no transferable skills.

(Tr. at 40).

[7]The Administrative Transcript Index contains an error with respect to Dr. Parikh's name, incorrectly labeling Exhibit No. 13F from Dr. Gita "Barikh."  As with other errors of this nature, the misspelling of Dr. Parikh's name is harmless with respect to the present review.  The Court indicates the error only for purposes of clarity.

to a full year. (Tr. at 383). Dr. Parikh did not clear Plaintiff to voluntarily participate in part time activities or employment, noting that "Organic Affective Disorder is a mood disorder which could cause significant distress or impairment in social, occupational or other important areas of functioning." Id.

On April 21, 2008, Dr. Parikh sent a letter to Plaintiff's Attorneys iterating Plaintiff's diagnosis of Organic Affective Disorder, Bipolar Disorder Mixed Type, and Heroine [sic] and Cocaine Abuse in remission. (Tr. at 385). Dr. Parikh reported that Plaintiff was currently compliant with treatment but indicated that due to his ongoing mental illness, he was unable to do any type of work for at least one full year. Id.

At the request of Plaintiff's Attorneys, Dr. Parikh completed an Impairment Questionnaire on December 19, 2008 reiterating Plaintiff's diagnosis and treatment. (Tr. at 386–393). By way of checklist, Dr. Parikh indicated a number of "clinical findings" including: poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, social withdrawal or isolation, and decreased energy. (Tr. at 387). Dr. Parikh listed Plaintiff's primary symptoms as "poor concentration; lack of energy; irritability; labile mood; lose [sic] of interest; anxiety [and] depression." (Tr. at 388). The remainder of the questionnaire is a series of questions and checklists—some left incomplete; some unexplained[8]—assessing the level of Plaintiff's impairment.

In addition to the aforementioned report, letter, and questionnaire, Dr. Parikh co-signed a narrative report submitted to Plaintiff's Attorneys on December 22, 2008. (Tr. at 395–96). This

---

[8]For example, questions numbered 12 and 17 require an explanation for a "yes" answer; both questions are answered in the affirmative, yet neither is accompanied by an explanation. (Tr. at 388–89).

letter was in response to Plaintiff's Attorneys request for clinical information regarding Plaintiff's social security claims. (Tr. at 395). The letter indicated that Plaintiff has been a patient of Dr. Parikh's since June 2007, and began treatment due to symptoms of depression and suicidal ideations. Id. This letter reiterates Plaintiff's initial diagnosis and reports Plaintiff's current diagnosis to be Bipolar Disorder-Mixed Type. (Tr. at 395–96). The letter concludes by indicating that "[i]n the best interest of [Plaintiff's] mental health, we find that due to his symptoms, he is not capable of completing his duties of employment efficiently." (Tr. at 396). The letter indicates that Dr. Parikh does not anticipate Plaintiff's return to work for 12 months.[9]

### 2. Plaintiff George Lambert's Testimony

At the ALJ Hearing on June 26, 2008, Plaintiff testified that he was 51 years old at the time of the hearing. (Tr. at 24). Plaintiff further testified that he had attended school for thirteen years, graduating high school and attending one year of college. (Tr. at 38). Plaintiff stated that his driver's license is suspended (Tr. at 38), but explained that he had taken the bus to the hearing and was able to take the bus to doctor appointments and grocery shopping. (Tr. at 25). Plaintiff stated that the last time he had worked was in 2004 (Tr. at 26) and explained that the bulk of his work experience was as a sanitation worker from 1985 to 1998. (Tr. at 27). As a sanitation worker, Plaintiff testified that it was not an easy job. Plaintiff testified that he would sometimes have to lift 50 pounds or more; that he would routinely have to lift 20 pounds; and that he would frequently have

---

[9]There is some discrepancy as to how long Plaintiff is anticipated to miss work as the letter lacks clarity. "We do not anticipate his return back to work, in which his condition will exceed 12 months in duration." (Tr. at 396). This statement either indicates that Dr. Parikh does not anticipate Plaintiff will return to work for twelve months, or that because Plaintiff's condition will last for more than twelve months he will not return to work at all. At any rate, Dr. Parikh's original assessment that Plaintiff's condition would last between six and twelve months—creating an end date of September 2008—seems to have been severely underestimated, as this Narrative Report anticipates more than twelve additional months starting December 2008. Compare Tr. at 383 with Tr. at 396.

to lift 10 pounds throughout the day. (Tr. at 27). In addition, the job required Plaintiff to be on his feet "[a]ll day." Id. Plaintiff explained that after working for the sanitation department, he worked a variety of jobs including as a loader for Federal Express, as an assembler, and as a machine operator. (Tr. at 28–29). Plaintiff was laid off in 2004 and looked for work up until he became ill. (Tr. at 30).

As to his illness, Plaintiff testified that he had used heroin on and off for about twenty years, and that he first learned that he had hepatitis C as a result of tests performed when he was working with doctors to combat his heroin addiction. Id. Plaintiff began taking Methadone to "get off the heroine [sic]" but developed a dependency issue. (Tr. at 30–31). At the time of the hearing, Plaintiff testified that he had not taken Methadone for one week and had not taken heroin for at least three years. (Tr. at 31). Plaintiff said that as part of his maintenance he meets with a group three times each week and with a therapist individually. (Tr. at 31–32). Plaintiff explained that initially he underwent Interferon treatment based on the advice of his prescribing physician, Dr. Leevy. (Tr. at 22–23). Despite Dr. Leevy's recommendation that the Interferon treatment continue, Dr. Parikh "decided for [Plaintiff] to stop taking the [Interferon]." (Tr. at 22). At the time of the hearing Plaintiff indicated that his physical symptoms included fatigue, pain in his lower back, and urination problems. (Tr. at 22–24; 33–34). Plaintiff testified that he takes two medicines prescribed by Dr. Parikh to help with depression and Ibuprofen for pain, but nothing for Hepatitis C.[10] (Tr. at 35–36).

Plaintiff testified that he lives in an apartment (Tr. at 24) with his mother. (Tr. at 36), and that he "tr[ies] to do whatever [he] can around the house to help [his] mother." (Tr. at 36). Plaintiff

---

[10]Due to Plaintiff's tendency towards addiction there is some concern regarding pain medications. (Tr. at 35).

then explained that he helps with laundry, garbage, "a little maintenance around the house," and grocery shopping.  (Tr. at 36–37).  Plaintiff described his daily activities, stating that he wakes up around six each morning, usually goes back to bed around nine or nine-thirty in the morning, tries to help out his mother, typically takes three, two-hour naps each day, and watches Television or movies after dinner.  (Tr. at 36–38).  When questioned if he had any problems showering, dressing, or shaving, the Plaintiff responded that he "can't move as fast as [he] used to as far as getting [his] clothes on."  (Tr. at 38).

## II. <u>STANDARD OF REVIEW</u>

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000).   Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance."  <u>Woody v. Sec'y of Health & Human Servs</u>, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather such relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (citation omitted).  Not all evidence is considered "substantial."   For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.   Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g. that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion.

<u>Wallace v. Sec'y of Health & Human Servs.</u>, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting <u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d Cir. 1983)).  The ALJ must make specific findings of fact to

support her ultimate conclusions.  Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  As such, it does not matter if this Court "acting de novo might have reached a different conclusion" than the Commissioner.  Monsour Med. Ctr. V. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)).  "The district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).  A Court must nevertheless "review the evidence in its totality."  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).

To properly review the findings of the ALJ, the court needs access to the ALJ's reasoning. Accordingly,

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record [her] reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  If the ALJ fails to properly indicate

12

why evidence was rejected, the court is not permitted to determine whether the evidence was discredited or simply ignored.  See Burnett v. Comm'r of Soc. Sec, 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

## III.  APPLICABLE LAW

### A.  THE FIVE-STEP PROCESS

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. A claimant is considered disabled under the Social Security Act if he or she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A).  A claimant bears the burden of establishing his or her disability.  Id. § 423(d)(5).  The Social Security Administration has established a five-step process or determining whether an individual is disabled.  20 C.F.R. § 404.1520(a) and § 416.920(a).

At step one, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b) and § 416.920(b).  Substantial gainful activity is work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant and productive physical or mental duties.  20 C.F.R. § 404.1572(a) and § 416.972(a).  "Gainful work activity" is work that is done (or intended) for pay or profit.  20 C.F.R. § 404.1572(b) and § 416.972(b).  If an individual engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are.  20 C.F.R. § 404.1520(b) and § 416.920(b).   If the claimant establishes that he or she is not currently engaged in such activity, the analysis proceeds to the second step.  Id.

13

The Commissioner, under step two, must determine whether the claimant suffers from a severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c) and § 416.920(c).  An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Id.  If an individual does not have a severe medically determinable impairment or combination of impairments, she or he is not disabled.  If the Commissioner finds a severe impairment or combination of impairments, the analysis proceeds to step three.

The analysis under step three requires a determination as to whether the claimant's impairment(s) is equal to, or exceeds, one of those included in the Listing of Impairments in Appendix 1 of the regulations ("Listings").  20 C.F.R. § 404.1520(d) and § 416.920(d).  Upon such a finding, the claimant is presumed to be disabled and is automatically entitled to benefits.  Id.  If, however, the claimant does not meet this burden, the Commissioner moves to the next step.

Before considering step four, the Commissioner must determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(e) and § 416.920(e).  RFC is an individuals ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  20 C.F.R. § 404.1545 and § 416.945.  A claimant RFC is based on consideration of all relevant medical and other evidence in the case record.  20 C.F.R. § 404.1520(e) and § 416.920(e).  Once the individuals RFC is determined, the analysis moves to step four.

Step four requires the Commissioner to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work.  20 C.F.R. § 404.1520(f) and § 416.920(f).  If the claimant can return to his or her previous work, then they are not disabled and therefore cannot obtain benefits.  Id.  If, however, the Commissioner determines that the claimant is unable to return

14

to his or her past relevant work, the analysis proceeds to step five.

The fifth, and final, step requires the Commissioner to determine whether the claimant can perform other work consistent with his or her medical impairments, age, education, past work experience and RFC.  20 C.F.R. § 404.1520(g) and § 416.920(g).  If the claimant is not able to do other work and meets the duration requirement, he or she will be found to be disabled.  20 C.F.R. §404.1520(a)(4)(v) and § 416.920(a)(4)(v).  If the claimant is able to do other work, he or she is not disabled.  Although claimant generally continues to have the burden of proving disability at this step, a limited burden is shifted to the Social Security Administration to provide evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do.  20 C.F.R. §404.1512(g) and § 416.912(g).

### B.  THE REQUIREMENT OF OBJECTIVE EVIDENCE

Under the Act, disability must be established by objective medical evidence.  "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A).  Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  Id.  Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A). Credibility is a significant factor. When examining the record:

> The adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. The requirement for a finding of credibility is found in 20 C.F.R. § 416.929(c)(4).

A claimant's symptoms, then, may be discredited "unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 416.929(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

### C.  ALCOHOL AND DRUG USE

Under the Social Security Act, even if an ALJ determines that a individual is disabled, the ALJ can still preclude an individual from obtaining benefits under 42 U.S.C. § 423(d)(2)(c). Pursuant to this statute,  a person "shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."   To determine whether alcoholism or drug addiction is a contributing material factor, the ALJ must assess whether he "would still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol."  20 C.F.R. § 416.935(b)(1).  The ALJ is specifically required to "evaluate which . . . current physical or mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling."  20 C.F.R. § 416.935(b)(2).  "If [the ALJ] determine[s] that [the claimant's] remaining limitations would not be disabling, [the ALJ] will find that [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability."  20 C.F.R. § 416.935(b)(2)(i).

# IV. <u>ANALYSIS</u>

On appeal, Plaintiff argues that the ALJ erred in denying his claims for a period of disability and disability insurance benefits, and for SSI for three reasons. First, he asserts that in determining that Plaintiff retained the functional capacity for simple, unskilled work, the ALJ improperly weighed the medical evidence. Plaintiff's Brief (Pl. Br.) at 6. In particular, Plaintiff claims it was improper for the ALJ to reject the "repeated assessment of Dr. Parikh that [Plaintiff] could not work at any full time job." <u>Id.</u> Second, he argues that the ALJ improperly assessed Plaintiff's credibility. (Pl. Br. 10). Finally, Plaintiff argues that the ALJ erred in failing to utilize a vocational expert to identify jobs accommodating Plaintiff's non-exertional limitations. (Pl. Br. 8).

To assess whether a claimant has established a disability, an ALJ must analyze his or her claims pursuant to the five-step process provided for in the Social Security Act. 20 C.F.R. § 404.1520(a) and § 416.920(a). In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2005, the alleged onset date. (Tr. at 11). Next, at step two, the ALJ found that the Plaintiff had the following severe impairments: depression, hepatitis C, and substance abuse in remission. <u>Id.</u> At step three, the ALJ found the Plaintiff not disabled because his impairments did not meet the medical equivalence criteria. <u>Id.</u> Before considering step four, the ALJ determined that the Plaintiff had the RFC to perform simple, unskilled work at the light level as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b). The ALJ determined at step four that Plaintiff was unable to perform any past relevant work. (Tr. at 14). Finally, at step five, based on Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. at 15).

**A. RESIDUAL FUNCTIONAL CAPACITY DETERMINATION**

Plaintiff contends that in making a determination about his RFC, the ALJ inappropriately weighed the medical evidence. (Pl. Br. 6). Specifically, Plaintiff claims that the ALJ improperly "rejected the repeated assessment of [his treating psychiatrist] Dr. Parikh that [Plaintiff] could not work at any fully time job and that he suffered from a mood disorder which caused significant impairment in social, occupational, and other areas of functioning." Id. The Court finds that the ALJ properly determined Plaintiff's residual functional capacity.

Residual functional capacity is an assessment of the most a claimant can do in a work setting despite his impairments. 20 C.F.R. §§ 404.1545 and 416.945. Using all relevant evidence in the record, it is the ALJ's responsibility to determine a claimant's RFC. 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), and 416.946. An RFC assessment involves considerations of a claimant's ability to meet physical and mental requirements of work." 20 C.F.R. §§ 404.1545(a)(4) and 416.945(a)(4).

**1. Physical Abilities**

In assessing physical abilities, the ALJ first assesses "the nature and extent of [a claimant's] physical limitations" and then determines the claimant's "residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b) and 416.945(b). "A limited ability to perform certain physical demands . . . [including] sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions . . . may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. §§ 404.1545(b) and 416.945(b). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighting up to ten

pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).  While the weight lifted may be very little, a job in this category requires a good deal of walking or standing, or involves mostly sitting with some pushing and pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b) and 416.967(b).

The physical portion of the ALJ's residual functional capacity determination was based on evidence from Dr. Rubenstein and Dr. Goldbas, as well as Plaintiff's own testimony at the ALJ hearing.  Upon physical examination, Dr. Rubenstein described Plaintiff's heart as regular and specifically found that Plaintiff had normal range of motion, normal muscle strength, a normal gait, and no difficulty getting on or off the examining table.  (Tr. at 253).  Dr. Goldbas's examination is consistent with Dr. Rubenstein's.   With regards to exertional limitations, Dr. Goldbas reported that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk with normal breaks for about six hours in an eight-hour work day, sit with normal breaks for about six hours in an eight-hour work day, and push and pull to the same extent as lifting.  (Tr. at 275). Additionally, Dr. Goldbas's report indicated no postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations.  (Tr. at 276–78).

There is no indication in Plaintiff's Brief or Plaintiff's Reply Brief that Plaintiff disputes the ALJ's findings as to the physical component on the RFC assessment.  In fact, Dr. Parikh's assessment of Plaintiff's physical abilities is entirely consistent with the reports of Doctors Rubenstein and Goldbas.  Dr. Parikh found the Plaintiff to be ambulatory and reported no functional limitations. (Tr. at 382).  Additionally, Dr. Parikh noted that Plaintiff exhibited no limitations in standing, walking, climbing, stooping, bending, and using his hands.  Id.  As to the physical exertion requirements of Plaintiff's RFC assessment, the ALJ's determination of light work is supported by substantial evidence.

19

## 2. __Mental Abilities__

In assessing mental abilities, the ALJ first assesses "the nature and extent of [a claimant's] mental limitations and restrictions" and then determines the claimant's "residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. §§ 404.1545(c) and 416.945(c).  "A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. §§ 404.1545(c) and 416.945(c).

The ALJ determined that Plaintiff's ability to perform light work was limited to "simple, unskilled work."  (Tr. at 11).  The ALJ made this determination after "consider[ing] all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence . . .."  Id.  Consistent with Federal Regulations, the ALJ considered objective medical evidence in the form of medical signs and laboratory findings, and other evidence, including statements and reports from Plaintiff and Plaintiff's treating and non-treating physicians regarding his medical history.   20 C.F.R. §§ 404.1529 and 416.929.  Additionally, the ALJ considered opinion evidence.  (Tr. at 11).  "Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, [residual functional capacity], and . . . physical or mental restrictions."   20 C.F.R. §§ 404.1527 and 416.927.

The objective medical evidence available to the ALJ regarding the mental portion of the RFC determination consists of the findings of Dr. D'Anton and Dr. Choe.  Dr. D'Anton, a state

20

psychological consultant, found that while Plaintiff had an adjustment disorder, this impairment was not severe. (Tr. at 260). The Regulations define a non-severe impairment as one that "does not significantly limit [a claimant's] . . . mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a) and 416.921(a). Dr. D'Anton recorded that Plaintiff was only "mildly" restricted in terms of daily living, social functioning, and abilities in maintaining concentration, persistence, or pace. (Tr. at 270). Additionally, Dr. D'Anton found Plaintiff to be alert and oriented in all spheres. (Tr. at 272). Similarly, Dr. Choe observed Plaintiff to be calm, and reported that Plaintiff was oriented to place, person, and time. (Tr. at 258). Further, Dr. Choe determined the Plaintiff's global assessment of functioning (GAF) score was 55, indicating only moderate symptoms. (Tr. at 13, 258).

In making Social Security determinations, the ALJ considers medical opinions as well. As noted, opinion evidence includes statements of the claimant and medical professionals reflecting judgments about the nature and severity of the claimant's impairments. While the ALJ considered the opinion evidence provided by Dr. Parikh, Plaintiff contends that the ALJ erred by not affording controlling weight to Dr. Parikh's medical opinions. (Pl. Br. 6–8). Relying on 20 C.F.R. § 404.1527(d)(2), Plaintiff argues that the ALJ was required to give more weight to Dr. Parikh's opinions. Plaintiff's reading of the Regulations is incomplete. The Regulations set forth that if the objective medical evidence and the opinion evidence are consistent, and there is sufficient evidence for the ALJ to make a determination, the determination will be made based on the totality of the evidence. 20 C.F.R. §§ 404.1527(c)(1) and 416.927(c)(1). As Plaintiff notes in his brief, "Generally, we give more weight to opinions from [a claimant's] treating sources . . .." (Pl. Br. 6 (quoting 20 C.F.R. § 404.1527(d)(2))). This general rule only applies, however, when the treating

sources medical opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.1527(d)(2) 416.927(d)(2).

In this case, the ALJ found the medical opinions of Dr. Parikh to be inconsistent with other substantial evidence. Specifically, ALJ Krappa noted in her opinion, that "[a]s for the opinion evidence, . . . the severity of the claimant's subjective complaints is not supported by the objective clinical and diagnostic test findings" (Tr. at 13). Based on the Regulations, if there is inconsistent evidence, the ALJ will weigh all of the evidence and see whether a determination can be made based on the evidence at hand. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). Plaintiff's claim that the ALJ was under an "affirmative duty" to re-contact Dr. Parikh to resolve the inconsistencies is misguided. (See Pl. Br. 8 (arguing that pursuant to 20 CFR § 404.1512(e)(1) the ALJ was required to contact Dr. Parikh to "clarify the opinion")). Only when the evidence of record is insufficient to determine disability must the ALJ re-contact the plaintiff's treating psychiatrist. 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3). Using all relevant evidence in the record, it is the ALJ's responsibility to determine a claimant's RFC. Based on a review of the record and the ALJ's well-reasoned opinion below, the ALJ's determination of "simple, unskilled work" is supported by substantial evidence.

For the reasons outlined above, Plaintiff's claim that the ALJ improperly weighed the medical evidence in determining Plaintiff retained an RFC for simple, unskilled work must fail.

**B. ASSESSMENT OF PLAINTIFF'S CREDIBILITY**

For similar reasons, Plaintiff's claim that the ALJ improperly assessed Plaintiff's credibility

is without merit.  The opinion below makes clear that the ALJ carefully considered Plaintiff's alleged symptoms an the extent to which such symptoms could be reasonably accepted as consistent with the objective medical evidence.  The ALJ found that while Plaintiff's "assertions of pain and symptoms are reasonable to a degree, the overall record does not support them to the debilitating extent asserted." (Tr. at 13).  There is substantial evidence supporting the ALJ's determination that objective medical evidence does not support Plaintiff's assertions.  The ALJ notes  that Dr. Rubenstein's examination did not reveal any significant abnormalities, the Plaintiff was compliant with treatment procedures, and that Plaintiff's condition "is well under control with medication." (Tr. at 13).

The Regulations reflect the reality that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).  In those situations, the ALJ "will carefully consider any other information" provided about the symptoms.   20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).  In this case, pursuant to the Regulations, the ALJ considered Plaintiff's daily activities, finding that "the claimant's activities of daily living indicate that he is not incapacitated by his impairments." (Tr. at 14).  Plaintiff argues that assessing Plaintiff's daily activities was "legally improper." (Pl. Br. at 10).  In support of this argument, Plaintiff cites the Third Circuit in Smith v. Califano, 637 F.2d 968 (3d Cir. 1981).  In Smith, the Third Circuit held that "shopping for the necessities of life is not a negation of disability ... [and that] [d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  Id. at 971.

Once again, however, Plaintiff fails to complete the analysis.  Regarding over-reliance on Smith v. Califano, the Third Circuit clarified that "[a]lthough certainly 'disability does not mean that

a claimant must vegetate in a dark room excluded from all forms of human and social activity,' it is nonetheless appropriate for the ALJ to consider 'the number and type of activities' in which the claimant engages."  Turby v. Barnhart, 54 Fed. Appx. 118, 122 n.1 (3d Cir. 2002) (quoting Smith v. Califano, 637 F.2d at 971 and Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002)). Contrary to Plaintiff's assertion, it was not legally improper for the ALJ to consider Plaintiff's daily activities. In this regard, the ALJ noted that Plaintiff is "able to care for his personal hygiene, [do] his own laundry, take[] out the garbage, prepare[] meals, help[] with the grocery shopping, attend[] narcotics anonymous meetings, and . . . take public transportation."  (Tr. at 14).

The ALJ concluded that Plaintiff's assertions of pain and symptoms were reasonable to a degree, but that assertions regarding the extent of Plaintiff's pain unsupported by the record. "[A]n ALJ may reject a claimant's subjective testimony if she does not find it credible so long as she explains why she is rejecting the testimony."  Hall v. Comm'r of Soc. Sec., 218 Fed. Appx. 212, 215 (3d Cir. 2007).  The ALJ cited objective medical evidence, Plaintiff's testimony as to daily activities, and the reality that "there is nothing in the evidence to show any deterioration in the claimant's condition." (Tr. at 14).  As such, the ALJ's determination is supported by substantial evidence and Plaintiff's claim that the ALJ improperly assessed Plaintiff's credibility must fail.

## C. VOCATIONAL EXPERT

Plaintiff's final claim is that the ALJ erred in failing to utilize a vocational expert to identify jobs accommodating Plaintiff's non-exertional limitations.  (Pl. Br. 8).  For the reasons outlined below, this Court agrees with Plaintiff, and finds that a vocational expert must be relied upon to provide evidence that demonstrates that "simple, unskilled work" exists in significant numbers in

the national economy that the Plaintiff can perform.

The final step of the Social Security Administration's five-step process requires the Commissioner to determine whether the claimant can perform other work consistent with his medical impairments, age, education, past work experience and RFC. 20 C.F.R. § 404.1520(g) and § 416.920(g). The Regulations make clear that a limited burden is shifted to the Social Security Administration to provide evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do. 20 C.F.R. §404.1512(g) and § 416.912(g). Prior to 1978, to meet this burden, vocational experts were used to "establish the existence of suitable jobs in the national economy for all claimants." Heckler v. Campbell, 461 U.S. 458, 461 (1983) (emphasis added). In 1978, to improve uniformity and efficiency, the Secretary of Health and Human Services promulgated the "[M]edical-[V]ocational [G]uidelines, or 'grids,' that establish the types and number of jobs that exist in the national economy for claimants with exertional impairments."[11] Sykes v. Apfel, 228 F.3d 259, 270 (3d Cir. 2000) (emphasis added).

While there is "considerable variety among the courts of appeals regarding the scope of the limitation on the use of the grids when a claimant has exertional and nonexertional impairments," Id. at 268, in the Third Circuit, the law regarding appropriate use of the grids is clear. As explained by the Court of Appeals:

> The grids establish, for exertional impairments only, that jobs exist in the national economy that people with those impairments can perform. When a claimant has an

---

[11] The Regulations establish that limitations are exertional if they affect the ability to meet the strength demands of a job and include sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(b). By contrast, limitations are non-exertional if they affect only a claimant's ability to meet demands of jobs other than strength demands. 20 C.F.R. § 416.969a(c). Non-exertional limitations include difficulty functioning due to anxiety or depression, difficulty maintaining concentration, difficulty seeing or hearing, and difficulty crouching. Id.

> additional nonexertional impairment, the question whether that impairment
> diminishes his residual functional capacity is functionally the same as the question
> whether there are jobs in the national economy that he can perform given his
> combination of impairments.  The grids do not purport to answer this question, and
> thus . . . the practice of the ALJ determining without taking additional evidence the
> effect of the nonexertional impairment on residual functional capacity cannot stand.

Sykes v. Apfel, 228 F.3d 259, 270 (3d Cir. 2000).  Stated differently, where "the ALJ assesses that the claimant has non-exertional limitations limiting [his] ability to work, the Commissioner cannot determine that such non-exertional impairments do not significantly erode the occupational base without taking [additional evidence]."  (Pl. Br. 9).  In order to meet this burden of proof, the Third Circuit has established that the "Commissioner must present . . . the testimony of a vocational expert or other similar evidence, such as a learned treatise."  Sykes, 228 F.3d at 273.  In the absence of such evidence, "the Commissioner cannot establish that there are jobs in the national economy that someone with claimant's combination of impairments can perform."  Id.

For example, Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 94 (3d Cir. 2007), held that "[t]he ALJ's reliance on the Guidelines in the presence of Appellant's nonexertional limitations constitute[d] reversible error under [Sykes]."  Similarly, this Circuit has held that when application of the grids is improper, other methods can be used to prove the claimant is capable of performing other jobs.  Jesurum v. Secretary, 48 F.3d 114, 121 (3d Cir. 1995) ("Preferably, this is done through the testimony of a vocational expert."); Washington v. Heckler, 756 F.2d 959, 967 (3d Cir. Pa. 1985) (finding reliance on the grids to be insufficient and some other evidence needed when the claimant suffers from both exertional and non-exertional impairments).

In the case at hand, the Plaintiff suffers from both exertional and non-exertional impairments. At step-two of the five-step process, the ALJ identified depression as one of Plaintiff's severe

impairments.  (Tr. at 11).  In assessing Plaintiff's residual functional capacity, the ALJ concluded the Plaintiff has the RFC to perform "<u>simple</u>, unskilled work at the light level." (Tr. at 11 (emphasis added)).  Despite the existence of both exertional and non-exertional impairments, the ALJ at step five, without the testimony of a vocational expert, or other similar evidence, found that Plaintiff could perform jobs that exist in significant numbers in the national economy.  (Tr. at 15). Specifically, the ALJ found that under the framework of grids, a finding of not disabled would be appropriate if the Plaintiff had the RFC to perform the "full range of light work."  <u>Id.</u>  Noting, however, that the Plaintiff did not have the RFC to perform the full range of light work, the ALJ went on to state that "the additional limitations [on Plaintiff's RFC] have little or no effect on the occupational base of unskilled light work."  <u>Id.</u>  The ALJ's failure to consult with a vocational expert requires this Court to remand on this specific issue.

The Commission argues that "[t]he Grid rules provide a sufficient basis for determining that jobs exist in significant numbers in the national economy that an individual can perform, even though the individual is limited to performing unskilled work." (Defendant's Brief (Def.'s Br.) 16). This argument lacks merit because as the Court has already noted, and as the Plaintiff's brief makes clear, the ALJ did not limit Plaintiff to only unskilled work.  (Pl. Reply Br. 3).  Instead, the ALJ "added a limitation that the work also be <u>simple</u>," <u>id.</u> (emphasis added), and the record makes clear that Plaintiff suffers from non-exertional impairments.  (<u>See</u> Tr. at 11 (identifying depression as one of Plaintiff's severe impairments)).  Therefore, the ALJ's failure to consult with a vocational expert requires this Court to remand on this specific issue.

The Court notes that in instances where an ALJ determines that Plaintiff has no non-exertional limitations, then a vocational expert need not be relied upon.  Here, however, where the

ALJ merely discounted the severity of such limitations, the assistance of a vocational expert is required.  See Hall v. Comm'r of Soc. Sec., 218 Fed. Appx. 212, 216–17 (3d Cir. 2007) (requiring, on remand, vocational evidence "to determine whether [claimant's] limitation to 'simple, repetitive tasks' further erodes the occupational base for unskilled light work); see also Sykes, 228 F.3d at 266 (finding that the Commissioner cannot on his own determine whether or not a claimant's non-exertional limitations will have an impact on his occupational base); McGill v. Comm'r of Soc. Sec., 2010 U.S. Dist. LEXIS 2508 (D.N.J. Jan. 13, 2010) (remanding where an ALJ summarily discounted claimant's depression as having "little or no effect on her occupational base of unskilled sedentary work"); Billingsley v. Comm'r of Soc. Sec., 2009 U.S. Dist. LEXIS 88634, at 13 (D.N.J. Sept. 25, 2009) ("[A] vocational expert must be consulted . . . even where the ALJ has concluded that the claimant's non-exertional limitation is not significant or will not substantially diminish the occupational base, because the ALJ is not in the position to make such a determination about the import of a non-exertional limitation.").

Under the circumstances here, the Commissioner must utilize a vocational expert, or other similar evidence, in order to determine whether, despite Plaintiff's exertional and non-exertional impairments, there are jobs that exist in significant numbers in the national economy that claimant can perform.

## V.  **CONCLUSION**

For the reasons stated, this matter is **remanded** for further proceedings consistent with this Opinion. An appropriate order follows this opinion.

    S/ Dennis M. Cavanaugh
    Dennis M. Cavanaugh, U.S.D.J.

Date:           November   18  , 2010
Original:       Clerk's Office
cc:             All Counsel of Record